## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LYLE YELLETS, | CASE NO. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| GEORGE GU, CRAIG KNIGHT, ERIK ANDERSON, ELAINE WONG, DENNIS EDWARDS, MARK GORDON, IVY BROWN, KI DEOK PARK, PETER HASKOPOULOS, VIKTOR MENG, JENNIFER AAKER, JANE KEARNS, PIERRE LAPEYRE, JR., DAVID LEUSCHEN, JIM MCDERMOTT, JEFFERY TEPPER, ROBERT TICHIO, and MICHAEL WARREN, | |
| Defendants, | |
| and | |
| HYZON MOTORS INC. f/k/a DECARBONIZATION PLUS ACQUISITION CORPORATION, | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Lyle Yellets ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of

Nominal Defendant Hyzon Motors Inc. f/k/a Decarbonization Plus Acquisition Corporation

("Hyzon" or the "Company"), files this Verified Shareholder Derivative Complaint against

Defendants George Gu, Craig Knight, Erik Anderson, Elaine Wong, Dennis Edwards, Mark

Gordon, Ivy Brown, Ki Deok Park, Peter Haskopoulos, Viktor Meng, Jennifer Aaker, Jane Kearns,

Pierre Lapeyre, Jr., David Leuschen, Jim McDermott, Jeffery Tepper, Robert Tichio, and Michael

Warren (collectively, the "Individual Defendants") for breaches of their fiduciary duties, among other causes of action. Plaintiff alleges the following based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included a review and analysis of public documents, including conference calls and announcements made by the Company and Individual Defendants, the Company's filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding Hyzon, news reports, securities analysts' reports and advisories about the Company, and public filings in the related federal securities class action lawsuit action pending in the U.S. District Court for the Western District of New York captioned, *Brennan v, Hyzon Motors Inc., et al.,* Case No. 6:21-cv-06636 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Hyzon against certain of its officers and directors to remedy the Individual Defendants' violations of law that have caused, and continue to cause, substantial harm to Hyzon and its shareholders.

2.      Hyzon is engaged in designing, developing, and manufacturing hydrogen-powered commercial vehicles and fuel cell systems and providing hydrogen mobility solutions, from hydrogen supply to fuel cell lifecycle management and vehicle leasing. This complaint arises from Hyzon's misrepresentations to investors regarding supply agreements and customer contracts.

3.      On July 16, 2021, Decarbonization Plus Acquisition Corporation ("DCRB"), a special purpose acquisition company, merged with Hyzon (the "Merger").

4.      In the months leading up to the Merger, Hyzon claimed to investors that consumer demand for hydrogen fuel vehicles warranted entry into the Merger, and that the Merger would

expand business operations exponentially. The Company also claimed the Merger would "expand deployments" of their hydrogen cell vehicles. Following the Merger, Hyzon represented that the Company had "top-tier" customers and partners, and that it had signed their arguably largest client, Hiringa. Each of these statements, and others described herein, turned out to be false.

5.      From February 9, 2021 through September 27, 2021 (the "Relevant Period"), the Individual Defendants made and permitted other Individual Defendants to make materially false and misleading statements and omissions, which failed to disclose, *inter alia*, that (a) Hyzon's touted partnerships were illusory; (b) Hiringa, one of the Company's supposedly biggest customers, was  only a channel partner, not a buyer; (c) Hyzon's financial projections were grossly inflated; and (d) Hyzon was unable to meet vehicle deliverables in 2021.

6.      On September 28, 2021, market analyst Blue Orca Capital published a report about the Company (the "Blue Orca Report") that disclosed what the Individual Defendants must have long known—that Hiringa was a small channel partner, not a buyer, and business deals with major corporations were illusory.

7.      As a result of this news, Hyzon's stock price fell $2.58 per share, or 28%, to close at $6.63 per share on September 28, 2021, thereby damaging investors and shareholders.

8.      Soon after, (i) Hyzon; (ii) Erik Anderson, the Company's President and Chief Executive Officer ("CEO") until the July 2021 merger; (iii) Peter Haskopoulos, the Company's Chief Financial Officer ("CFO") until the July 2021 merger; (iv) Craig Knight, the Company's CEO; and (v) Mark Gordon, the Company's CFO (the "Securities Defendants") were named as defendants in the Securities Action, which has subjected the Company to significant losses.

9.      In addition to defending and potentially paying class wide liability in the Securities Action, the Individual Defendants' conduct has subjected the Company to internal investigations,

3

losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company, among other damages.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act (the "Exchange Act") and Rule 14a-9 of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Hyzon is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Hyzon, occurred in this District; and (iv) Defendants have received substantial compensation in

4

this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

14.     Plaintiff Lyle Yellets has continuously been a shareholder of Hyzon since February 2021.

**Nominal Defendant**

15.     Nominal Defendant Hyzon is incorporated in the State of Delaware and maintains its principal executive offices at 475 Quaker Meeting House Road, Honeoye Falls, New York 14472. Hyzon common stock and Hyzon warrants trade on the NASDAQ under the ticker symbols "HYZN" and "HYZNW," respectively.

16.     Defendant George Gu ("Gu") has served as a Class III director and as Executive Chairman of the Board since the July 2021 merger. The Company's employment agreement with Gu provides for a base salary of $475,000, and an annual target bonus opportunity of up to 70% of base salary. According to the Company's Form 8-K filed with the SEC on July 22, 2021, Defendant Gu beneficially owned 5,759,000 shares of the Company's stock. Based upon the closing price on July 22, 2021, Gu beneficially owned $44,344,300 of Hyzon stock.

17.     Defendant Craig Knight ("Knight") is the co-founder of Hyzon Motors USA, where he served as CEO from August 2020 until the July 2021 merger. Following the consummation of the merger, Defendant Knight was appointed as the Company's CEO. The Company's employment agreement with Knight provides a base salary of $450,000, and an annual target bonus opportunity of up to 70% of base salary. Additionally, Defendant Knight serves as a Class III director of the Board. According to the Company's Form 8-K filed with the SEC, on July

22, 2021, Defendant Knight beneficially owned 5,714,700 shares of the Company's stock. Based upon the closing price on July 22, 2021, Knight beneficially owned $44,003,190 of Hyzon stock.

18.      Defendant Erik Anderson ("Anderson") served as the Company's President and Chief Executive Officer ("CEO") throughout the Relevant Period until the July 2021 merger. Following the consummation of the business combination, Defendant Anderson serves as a Class III director of the Board and as chair of the Company's compensation committee. According to the Company's Form 8-K filed with the SEC on July 22, 2021, Anderson beneficially owned 630,947 shares of the Company's stock. Based upon the closing price of the Company on July 22, 2021, Anderson beneficially owned $4,858,291.90 of Hyzon stock.

19.      Defendant Elaine Wong ("Wong") has served as a Class I director since the July 2021 merger. In addition, Defendant Wong serves on the audit committee and serves as chair of the nominating and corporate governance committee. According to the Company's Form 8-K filed with the SEC on July 22, 2021, Defendant Wong beneficially owned 781,386 shares of the Company's stock. Based upon the closing price on July 22, 2021, Anderson beneficially owned $6,016,672.20 of Hyzon stock.

20.      Defendant Dennis Edwards ("Edwards") has served as a Class I director since the July 2021 merger.  In addition, he serves on the Compensation Committee and the Nominating and Corporate Governance Committee. According to the Company's Form 8-K filed with the SEC on July 22, 2021, Defendant Edwards beneficially owned 177,220 shares of the Company's stock. Based upon the closing price on July 22, 2021, Defendant Edwards beneficially owned $1,364,594 of Hyzon stock.

21.      Defendant Mark Gordon ("Gordon") served as the Company's CFO throughout the Relevant Period until the July 2021 merger. Following the consummation of the merger,

Defendant Gordon was appointed as the Company's CFO and also serves as a Class I director of the Board.

22. Defendant Ivy Brown ("Brown") has served as a Class II director since the July 2021 merger. Additionally, Defendant Brown serves as the Chair of the Company's Audit Committee.

23. Defendant Ki Deok Park ("Park") has served as a Class II director since the July 2021 merger. In addition, Defendant Park serves on the Audit Committee.

24. Defendant Peter Haskopoulos served as the Company's Chief Financial Officer ("CFO") throughout the Relevant Period until the July 2021 merger.

25. Defendant Viktor Meng ("Meng") has served as a Class II director since the July 2021 merger. In addition, he serves on the compensation committee and the nominating and corporate governance committee. According to the Company's Form 8-K filed with the SEC on July 22, 2021, Defendant Meng beneficially owned 44,300 shares of the Company's stock. Based upon the closing price on July 22, 2021, Defendant Meng beneficially owned $341,110 of Hyzon stock.

26. Defendant Jennifer Aaker ("Aaker") served as a DCRB director from October 2020 until the Merger.

27. Defendant Jane Kearns ("Kearns") served as a DCRB director from October 2020 until the Merger.

28. Defendant Pierre Lapeyre, Jr. ("Lapeyre") served as a DCRB director from October 2020 until the Merger.

29. Defendant David Leuschen ("Leuschen") served as a DCRB director from October 2020 until the Merger.

7

30.     Defendant Jim McDermott ("McDermott") served as a DCRB director from October 2020 until the Merger.

31.     Defendant Jeffrey Tepper ("Tepper") served as a DCRB director from October 2020 until the Merger.

32.     Defendant Robert Tichio ("Tichio") served as a DCRB director from August 2020 until the Merger.

33.     Defendant Michael Warren ("Warren") served as a DCRB director from November 2020 until the Merger.

34.     Defendants Gu, Knight, Anderson, Wong, Edwards, Gordon, Brown, Park, and Meng comprise the current Board and are sometimes hereinafter referred to as the Director Defendants.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers, directors, and/or fiduciaries of Hyzon and because of their ability to control the business and corporate affairs of Hyzon, the Individual Defendants owed Hyzon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage Hyzon in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hyzon and its shareholders to benefit all shareholders equitably.

36.     Each director and officer of the Company owes Hyzon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

37.     As fiduciaries of Hyzon, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

38.     The officers and directors of Hyzon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

39.     Each Individual Defendant, under his or her position as a director and/or officer, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. As Hyzon's directors and officers, the Individual Defendants knowingly acted with reckless disregard of their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

40.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

41.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a)      Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, the United States, and pursuant to Hyzon's Code of Conduct and internal guidelines;

b)      Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)      Remain informed as to how Hyzon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection in addition to that, and to take steps to correct such conditions or practices;

d)      Establish and maintain systematic and accurate records and reports of the business and internal affairs of Hyzon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)      Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Hyzon's operations would comply with all laws and that Hyzon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f)      Exercise reasonable control and supervision over the Company's officers and employees' public statements and any other reports or information that the Company was required by law to disseminate;

g)      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)      Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.      Each of the Individual Defendants further owed Hyzon and its shareholders the duty of loyalty, which requires that each favor Hyzon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.      At all times relevant hereto, the Individual Defendants were the agents of each other and Hyzon and were at all times acting within the course and scope of such agency.

44.      The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with Hyzon.

45.      The Individual Defendants, because of their positions of control and authority, were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hyzon.

**HYZON'S CODE OF CONDUCT**

46.      The Individual Defendants, as officers and/or directors of Hyzon, were bound by the Company's Code of Business Conduct and Ethics (the "Code"). Hyzon deeply values ethical principles, with integrity at the forefront. The Code states in pertinent part:

It is the policy of Hyzon that all of its Service Providers adhere to the following principles:

- Honesty and candor in our activities, including observance of the spirit, as well as the letter of the law;

- Avoidance of conflicts between personal interests and the interests of Hyzon, or even the appearance of such conflicts;

11

- Avoidance of solicitations of contributions to any charity or for any political candidate from any person or entity that does business or seeks to do business with us;

- Compliance with generally accepted accounting principles and controls;

- Maintenance of our reputation and avoidance of activities which might reflect adversely on Hyzon; and

Integrity in dealing with the Hyzon's assets.

47.    The Code further provides:

Hyzon will take appropriate action if anyone violates the standards in this Code, including disciplinary action, which, in appropriate circumstances, may include termination of employment for cause (for employees), termination of contract or assignment, removal from the Board (for directors), legal action or referral for criminal prosecution.

48.    The Code of Conduct further states the obligations and duties of the Company's

employees and directors, specifically:

Candor Among Employees and in Dealing with Auditors and Counsel

- *Do Not Conceal Violations*. Hyzon's senior management must be informed at all times of matters that might adversely affect Hyzon's reputation, regardless of the source of such information. Moreover, complete candor is essential in dealing with Hyzon's independent auditors and attorneys. You should inform your direct manager or Human Resources (for employees) or the Office of Compliance (for other Service Providers) of any such information of which you become aware

49.    The Code details the importance of accurate public recording, specifically,

Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting

We strive to maintain integrity of our records and public disclosure. Our corporate and business records, including all supporting entries to our books of account, must be completed  honestly, accurately and understandably. We depend on our books, records and accounts accurately and fairly reflecting, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of our records and public disclosure, we require that:

- no entry be made in our books and records that is intentionally false or misleading;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- Service Providers comply with our system of internal controls and be held accountable for their entries;

- any off-balance sheet arrangements of Hyzon are clearly and appropriately disclosed;

- Service Providers work cooperatively with Hyzon's independent auditors in their review of Hyzon's financial statements and disclosure documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off the-books" fund; and

- records be retained or destroyed according to Hyzon's document retention policies or procedures then in effect.

Our disclosure controls and procedures are designed to help ensure that Hyzon's reports and documents filed with or submitted to the United States Securities and Exchange Commission (the "**SEC**") and other public disclosures are complete, fair and accurate, fairly present our financial condition and results of operations and are timely and understandable.

50.     Lastly, the Code details the importance of corporate disclosures of possible

violations, specifically:

Clarifying Questions and Concerns; Reporting Possible Violations

If you encounter a situation or are considering a course of action and its appropriateness is unclear, you should discuss the matter promptly with your supervisor, if applicable, or the Office of Compliance; even the appearance of impropriety can be very damaging to Hyzon and should be avoided.

- *Do Not Conceal Violations.* If you are aware of a suspected or actual violation of this Code by others, it is your responsibility to report it. Failure to report such events constitute a violation of this Code. Reporting procedures, including anonymous reporting procedures, are described in the Whistleblower Policy.

- *Retaliation.* You should raise questions or report potential violations of this Code without any fear of retaliation in any form – it is our policy not to retaliate in such circumstances and we will take prompt disciplinary action, up to and including termination of employment for cause, against any director, officer or Service Provider who retaliates against you.

## ADDITIONAL DUTIES OF THE AUDIT COMMITTEE DEFENDANTS

51.     In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, Defendants Brown, Wong, and Park (the "Audit Committee Defendants"), owed specific duties to Hyzon under the Audit Committee Charter (the "Audit Charter"). Specifically, the Audit Charter provides the Audit Committee Defendants with the following responsibilities:

1.     assist Board oversight (i) of the integrity of the Company's financial statements, (ii) of the Company's compliance with legal and regulatory requirements, (iii) in assessing the independent auditors' qualifications and independence, and (iv) in assessing the performance of the independent auditor and the Company's internal audit function; and

2.     prepare an audit committee report as required by the SEC for inclusion in the Company's annual proxy statement.

The function of the Audit Committee is oversight. The management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements. Management is responsible for maintaining appropriate accounting and financial reporting principles and policies and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The independent auditors are responsible for planning and carrying out a proper audit of the Company's annual financial statements, reviews of the Company's quarterly financial statements prior to the filing of each quarterly report on Form 10-Q, annually auditing management's assessment of the effectiveness of internal control over financial reporting at such time as the Company becomes subject to such requirement and other procedures. In fulfilling their responsibilities hereunder, it is recognized that members of the Audit Committee are not full-time employees of the Company and are not, and do not represent themselves to be, performing the functions of accountants or auditors. As such, it is not the duty or responsibility of the Audit Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures or to set auditor independence standards, and each member of the Audit Committee shall be entitled to rely on (i) the integrity of those persons and organizations within and outside the Company from which it receives information, and (ii) the accuracy of the financial and other information provided to the Audit

14

Committee by such persons or organizations absent actual knowledge to the contrary (which shall be promptly reported to the Board) and (iii) representations made by management as to any information technology, internal audit and other non-audit services provided by the auditors to the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and

15

substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

55.     Each of the Individual Defendants aided, abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Hyzon and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

57.     Hyzon is a global supplier of zero-emissions hydrogen fuel cell powered commercial vehicles, including heavy duty trucks, buses, and coaches. Hyzon wanted to expand globally, infiltrating the commercial diesel fuel market with its innovative technology of zero-emission hydrogen fuel. To accomplish this expeditiously, Hyzon sought to become a publicly traded corporation by merging with a special purpose acquisition company ("SPAC"), DCRB. Through a SPAC, Hyzon was able to attempt to raise the capital necessary to build a hydrogen fueling infrastructure.

## The Individual Defendant's False and Misleading Statements

58.     On February 9, 2021, Hyzon and DCRB issued a joint press release announcing their business combination agreement, which would allow Hyzon to become a publicly traded

corporation (the "February Press Release"). The February Press release stated the following in pertinent part:

- ***Proceeds to fully fund and accelerate Hyzon's well-defined growth strategy in the hydrogen fuel cell-powered, zero-emission commercial transportation sector***

- ***Hyzon's technology already commercialized with existing global footprint, and sales pipeline with blue-chip Fortune 100s and municipalities***

Hyzon Motors Inc. ("Hyzon" or "the Company"), the industry-leading global supplier of zero-emissions hydrogen fuel cell powered commercial vehicles, and Decarbonization Plus Acquisition Corporation ("DCRB") (NASDAQ: DCRB) today announced a definitive agreement for a business combination that would result in Hyzon becoming a publicly listed company.

Hyzon, headquartered in Rochester, New York, is a differentiated, pure-play, independent mobility company with an exclusive focus on hydrogen in the commercial vehicle market. The Company's proven and proprietary hydrogen fuel cell technology enables zero emission, fleet based, commercial transport at competitive performance as measured against both traditional fuel sources and other alternative vehicle power sources. Through its partnerships with market-leading suppliers and manufacturers, and the Company's commercial relationships with retailers, consumer goods companies, natural resource firms and governments, ***Hyzon has rapidly expanded its commercial reach with supply agreements to customers around the world***. With a demonstrated technology advantage, leading fuel cell performance and a history of rapid innovation, Hyzon is catalyzing the adoption of hydrogen heavy vehicles.

*"We are excited to partner with DCRB at an important inflection point for our company, hydrogen and society,"* said Craig Knight, Chief Executive Officer and Co-Founder of Hyzon.

**"Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors, and our committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions.**"

George Gu, Chairman and Co-Founder of Hyzon remarked, "***This business combination will enable us to expand deployments of our zero-emission hydrogen fuel cell powered heavy vehicles globally, and to continue leading the hydrogen transition.***

*"We are incredibly excited about the dynamic mobility category as municipalities and **Fortune 100 companies are rapidly embracing hydrogen as the essential pathway to a net-zero economy**.*

*"The number of countries cementing and then enhancing their national hydrogen strategies expands almost weekly, and **we are extremely encouraged by both investor and public interest in the hydrogen economy.**"*

Robert Tichio, Chairman of the Board of DCRB and a Partner at Riverstone Holdings LLC, said, *"...When forming this investment vehicle our objective was clear: to identify a truly exceptional company that is decarbonizing the global economy, **disrupting an established industry with the commercialization of innovative technologies**, and is well aligned with ESG principles. We found that company in Hyzon."*

(Emphasis added).[1]

59.     According to the Company's Form 8-K filed with the SEC on February 9, 2021, the Company touted its "Top Tier Customers/End Users/Partners," "Customer Deployments," and "Vehicle Customers" in their presentation slides. Hyzon listed blue chip corporations, such as: Coca-Cola, Bank of America, Heineken, and Nestle. The Company asserted that the demand for hydrogen-fueled vehicles was accelerating rapidly and represented to its investors that customer deployments were underway. The Company displayed on its slides the Vehicle projected deliveries.

---

[1] Hyzon Media Release, *Hyzon Motors, the Leading Hydrogen Fuel Cell Heavy Vehicle Company, Announces Business Combination with Decarbonization Plus Acquisition Corporation; Combined Company Expected to be Listed on Nasdaq*, Feb. 9 , 2021, available at https://hyzonmotors.com/wp-content/uploads/2021/02/Hyzon-DCRB-Transaction-Press-Release-02.09.21-Final.pdf





60.     On March 1, 2021, the Company filed its annual report for the year ended December 31, 2020 on a Form 10-K with the SEC (the "2020 10-K"). The 2020 Annual Report was signed by Defendants Anderson and Haskopoulos and contained certifications attesting to the accuracy of the financial statements and the disclosure of all fraud.

61.     On May 24, 2021, the Company filed its quarterly report for the quarter ended March 31, 2021 on Form 10-Q with the SEC (the "1Q21 Report"). The 1Q21 Report was signed by Defendant Anderson and contained certifications attesting to the accuracy of the financial statements and the disclosure of all fraud.

62.     On June 1, 2021, the Company filed with the SEC soliciting material under Rule 14a-12 dated May 29, 2021 which stated the following, in pertinent part, regarding the Company's definitive purchase agreements:

> Hyzon Motors Announces New 50 Tonne Fuel Cell Truck Orders with Leading Dutch Transport Companies, Jan Bakker and Millenaar & van Schaik
>
> - Hyzon signs definitive purchase agreements to **supply a total of up to 20 hydrogen fuel cell powered trucks with subsidiaries of Jan Bakker Transport and Millenaar & van Schaik**
>
> - **Hyzon expects to deliver up to three trucks in 2021**, followed by the remaining trucks in 2022
>
> - Trucks will be assembled out of Hyzon's European facility in the Groningen area of the Netherlands
>
> ***
>
> Hyzon expects to deliver up to three vehicles in Q4 of 2021, and to deliver the remaining trucks in 2022.
>
> ***
>
> Craig Knight, Hyzon CEO, said, "We are excited to be engaging with transport and logistics organizations like Jan Bakker and Millenaar & van Schaik, to bring hydrogen fuel cell powered trucks to the Netherlands. **These contracts further underline the interest in Hyzon's products in the European market, where we have seen strong uptake in zero-emission heavy vehicles."**

(Emphasis added).[2]

---

[2] Hyzon Proxy Statement, June 1, 2021, available at
https://www.sec.gov/Archives/edgar/data/0001716583/000119312521177707/d190071ddefa14a.htm

63.     On June 2, 2021, the Company filed with the SEC soliciting material under Rule 14a-12 which stated the following, in pertinent part, regarding the Company's definitive purchase agreements and partnerships:

> Hyzon Motors Announces Order for up to 70 Hydrogen Trucks from Austrian Supermarket Chain
>
> - Hyzon Motors signs definitive agreement to supply up to 70 hydrogen fuel cell powered heavy trucks to a leading Austrian grocery store chain with ~300 locations
>
> - Hyzon expects to begin delivering trucks in 2021, with all trucks expected to be delivered over the course of three years
>
> - Hyzon and MPREIS have further partnered on a feasibility study for hydrogen fuel cell powered vehicles in alpine condition
>
> ***
>
> The initial delivery is planned for Q4 of 2021, with the remaining trucks to be delivered over the course of three years.
>
> ***
>
> **The partnership marks an important milestone**, as MPREIS is doing its part to support the transition to a zero-emission society.
>
> ***
>
> Craig Knight, Hyzon CEO, said, "MPREIS has made an impressive commitment to the green hydrogen economy, and we are proud to partner with them in our shared goal of transitioning to a zero-emission reality. ***The MPREIS and Hyzon partnership is yet another proof point that demonstrates this transition can start today – the technology, the capital, and the momentum are ready***."

(Emphasis added).[3]

64.     On June 21, 2021, the Company filed with the SEC a Proxy Statement on Schedule 14A (the "2021 Proxy Statement"), which stated the following, in pertinent part, regarding the Company's deliverables and supply agreements:

> Initial deliveries of Hyzon-branded commercial vehicles are expected this year.
>
> ***

---

[3] Hyzon Proxy Statement, June 2, 2021, available at
https://www.sec.gov/Archives/edgar/data/0001716583/000119312521179856/d422430ddefa14a.htm,

To date, Hyzon has received orders for Hyzon-branded commercial vehicles and coach buses in an aggregate value of approximately $18.2 million from companies around the world, including Fortescue Metals Group Ltd., and Hyzon's counterparties have paid $1.8 million in deposits in respect of such orders. Hyzon also has an order valued at $1.47 million to integrate a hydrogen fuel cell system built around its next generation fuel cell stacks into aircraft, in respect of which Hyzon's counterparty has paid a deposit of $0.7 million. Hyzon's orders each include terms permitting the counterparty to cancel or suspend some or all of their obligations thereunder without cause, with little or no prior notice and without penalty or early termination payments. However, Hyzon currently expects that these orders will be fulfilled and has determined that each a contract with a customer exists in accordance with ASC 606 10 25 1. The transaction price associated with the subset of these contracts entered into prior to December 31, 2020 has accordingly been disclosed as a remaining performance obligation pursuant to ASC 606-10-50-13 through 50-15 (refer to Note 3: Revenues, within the Notes to Hyzon's Consolidated Financial Statements).

*** 

Timeline

In Europe, Hyzon commenced assembling commercial vehicles in its Winschoten facility in February 2021, and most current European and Australia/New Zealand commercial vehicle sales are expected to be fulfilled by the Winschoten facility, with first deliveries targeted for the second quarter of 2021.

(Internal footnote omitted).

65.     The 2021 Proxy Statement called for Hyzon shareholders to, *inter alia*, (a) approve the Merger; (b) elect Defendants Anderson, Brown, Edwards, Gordon, Gu, Knight, Meng, Park, and Wong to the Company's post-Merger Board; (c) approve the issuance of up to 243 million shares of Company common stock; and (d) approve the New Hyzon 2021 Equity Incentive Plan.

66.     The 2021 Proxy Statement further stated that, "[i]n Europe, Hyzon commenced assembling commercial vehicles in its Winschoten facility in February 2021, and most current European and Australia/New Zealand commercial vehicle sales are expected to be fulfilled by the Winschoten facility, with first deliveries targeted for the second quarter of 2021."

67.     On July 22, 2021, Hyzon filed a current report with the SEC on Form 8-K, which was signed by Defendant Knight, and which incorporated the 2021 Proxy Statement, including the false and misleading statements contained therein, by reference.

68.     On August 11, 2021, the Company issued a press release entitled "Hyzon Motors Announces Second Quarter 2021 Financial Results," which stated the Company "reaffirms 2021 sales outlook, ***including 85 vehicles to be shipped worldwide***[.]"[4]

69.     On September 9, 2021, the Company issued a press release entitled "Hyzon Motors to supply up to 500 hydrogen fuel cell electric vehicles to Shanghai logistics company" which stated the following, in pertinent part, regarding the Company's deliverables and partnerships:

> Under the non-binding MoU, the initial order of 100 vehicles is expected before the end of 2021 while the other 400 vehicles will be ordered in 2022.
>
> HongYun Automobile focuses on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles. The company provides operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers. After Hyzon delivers the vehicles, HongYun will be responsible for the subsequent commercial arrangements with its end customers.
>
> "Hydrogen fuel cell technology has been adopted more quickly in China than in the rest of the world," said Hyzon CEO Craig Knight. "This allows Hyzon to begin the critical work of decarbonizing the environment, while building experience, capacity, and expertise which will be applied globally."[5]

70.     The statements identified in ¶¶ 59-70 were false and misleading and failed to disclose, *inter alia,* that: (a) Hyzon's touted deals with blue-chip corporations were illusory; (b) Hiringa was a channel partner, not a buyer, (c) Hyzon's financial projections were grossly inflated; and (d) Hyzon was unable to meet vehicle deliverables in 2021.

## **THE TRUTH EMERGES**

71.     On September 28, 2021, Blue Orca Report disclosed the following, in pertinent part, regarding the Company's touted deals:

> In our opinion, Hyzon's supposed major customers are a fake-looking Chinese shell

---

[4] Hyzon Press Release, *Hyzon Motors Announces Second Quarter 2021 Financial Results*, Aug. 11, 2021, available at https://hyzonmotors.com/on-the-roads-of-rochester/ (emphasis added).
[5] Hyzon Press Release, *Hyzon Motors to Supply up to 500 Hydrogen Guel Cell Electric Vehicles to Shanghai Logistics Company*, Sep. 9, 2021, available at https://hyzonmotors.com/hyzon-motors-to-supply-up-to-500-hydrogen-fuel-cell-electric-vehicles-to-shanghai-logistics-company/.

company incorporated three days before the deal announcement and a tiny New Zealand startup which told us they are not really a customer.

Hyzon is just a repackaging of a flailing Chinese parent company which has been trying to sell the same hydrogen fuel cells without much success for 17 years. The parent entity was delisted from the Chinese OTC exchange in early 2021 at an enterprise value of sub $200 million. Hyzon is just a worse version of this same business in SPAC form, yet trades at 10x the valuation. We think Chinese investors obviously knew best.

1. **Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced.** We think Hyzon's largest customer looks fake. On September 9, 2021, Hyzon's stock shot up 29% on a pre-market announcement that it secured a major new deal for 500 trucks (including 100 orders in 2021) from a new Chinese customer, Shanghai HongYun. Yet Chinese government records show that Shanghai HongYun was **established only three days before Hyzon announced the deal** and has **no paid in capital.** It has no WeChat account or website. The supposedly major customer appears to be just an empty shell entity. In our opinion, such evidence suggests that Hyzon announced a major order with a fake looking Chinese customer just to pump its stock price.

2. **Channel Checks Reveal Next Largest Customer Not Really a Customer.** Hyzon claims that a New Zealand infrastructure startup named Hiringa supposedly signed an agreement to order 1,500 trucks by 2026, purportedly making it Hyzon's next largest customer. Yet when we channel checked these claims with Hiringa, its executive **clarified that Hiringa was not actually a customer, but a "channel partner"** assisting Hyzon in marketing vehicles to real end customers in New Zealand. Hiringa is a small startup operating out of a house in New Zealand which wants to raise money to build hydrogen fuel stations. Based on our conversation, Hiringa has neither the capability nor the current intention to purchase trucks from Hyzon.

- **Significant 2021 Delivery and Guidance Miss.** According to Hyzon, Hiringa will account for 24% of the Company's projected deliveries in 2021. Yet Hiringa **stated point blank that no deliveries would be taken in 2021**, and the first validation trucks would be delivered for testing in *March or April 2022*, at the earliest. Hiringa supposedly accounts for 24% of Hyzon's projected 2021 deliveries, so we expect a major guidance miss. We think it is highly misleading for Hyzon to continually reaffirm delivery and revenue guidance and characterize such revenues as "100% certain" when Hiringa admits that it will not take any deliveries this year.

3. **Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections.** In its much hyped initial investor presentation filed in February 2021, Hyzon generated considerable buzz around its SPAC by claiming that big household names - including **Coca Cola, Ikea, and Heineken** - were already "top tier customers" and "partners." Yet in the following months, after other EV SPACs

like Lordstown Motors got into trouble for fabricating customer contracts, Hyzon quietly dropped these household names from its investor decks. In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared from its disclosures altogether. In aggregate, Hyzon dropped customers supposedly accounting for $700 million in future orders from its subsequent decks. Remarkably however, despite apparently losing many of its most prominent customers, Hyzon's financial projections remained unchanged. We think it's highly misleading for Hyzon to have apparently lost most of its blue-chip customers without substantially revising future revenue projections downward.

- **Former Executives Left in Part Because of Concerns over Misrepresentations on Customer Contracts.** We spoke with one former senior executive who left the Company after only a few months. He said he "didn't like the way [customer contracts] were being presented" and compared Hyzon "**a bit like unfortunately what Nikola was doing…***I was very uncomfortable with that.*" In our opinion, such accounts corroborate the other evidence showing that Hyzon is likely overstating customer relationships or misrepresenting its contracts.

4. **Hyzon is Just a Repackaging of Its Chinese Parent Company, a 17-year-old Business Recently Valued as a Microcap.** Hyzon is just a repackaging of its parent company, *Horizon*, a Chinese hydrogen fuel cell business that recently delisted from the Chinese OTC market in March 2021 at an enterprise value of just $190 million. *Horizon* has been trying to sell its fuel cell technology for years, without meaningful success. Chinese filings published by *Jiangsu Horizon* suggest that its **fuel cell unit sales have declined by 81% since 2019**. By the time Hyzon's parent delisted, *Horizon* struggled with minimal (and declining) sales and a microcap valuation, making it absurd that Hyzon garnered a 10x valuation on the notion that it has some preferential "access" to the same fuel cell technology.

5. **Hyzon's Projections are Fantasy: Parent's Financials and Former Executives Suggest Hyzon May Earn 5-10% Gross Margins, at Best**. Without any current revenue, Hyzon's share price is contingent on its projected 32% gross margins on future vehicle sales. This is pure fantasy. To put Hyzon's projected gross margins in perspective, a 32% projected gross margin is nearly the twice the industry average for established vehicle manufacturers. The leading EV brand, Tesla, reports a gross margin of 22%. Hyzon doesn't make vehicles, nor does it plan to. It pays other companies to retrofit vehicles with fuel cells purchased from its parent company. A former Hyzon senior executive projected that Hyzon would likely generate **gross margins of 5-10% on vehicle sales at best.** Even when Hyzon starts making fuel cells itself, which will not be for some time, its parent's Chinese financials show that fuel cell manufacturing is only a small fraction of the EV production value chain. At either industry average margins (likely too generous) or a more realistic 5-10% gross margin, we don't think Hyzon will generate any positive EBITDA or free cash flow in the next five years.

6. **Two CTO Resignations in 15 Months.** Hyzon is a zero revenue SPAC whose

stock price is contingent on the value of its yet undeveloped vehicle technology to generate future revenues. Yet **two of Hyzon's CTOs have resigned in the past 15 months**, even though Hyzon was only formed 20 months ago. The first CTO resigned after just five months at Hyzon. The second, Gary Robb, just resigned (September 2021). If Hyzon's technology is supposedly world class, and the foundation for its hockey stick like future revenue growth, we question why the critical officers in charge of such technology apparently have such little faith in either the Company or the technology (or both) that they stepped down, despite the obvious financial incentives to remain at the SPAC.

Ultimately, we think Hyzon's parent has taken advantage of the general suspension of disbelief in financial markets to enrich insiders by repackaging an old technology in a fig leaf of misleading deal announcements and illusory customer contracts. In our opinion, it is akin to a *Chinese Lordstwon Motors*.

***

### 1.      Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced.

We think Hyzon's largest customer looks fake. On September 9, 2021, Hyzon's stock shot up 29% largely on the strength of a pre-market announcement by the Company that it had secured a major new vehicle deal. Hyzon announced that it had signed a Memorandum of Understanding ("MoU") with a new Chinese customer, Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun"), for the sale of 500 trucks. In the announcement, Hyzon claimed that the customer expects to order 100 of these trucks in 2021, with the remaining 400 trucks to be ordered in 2022. This makes Shanghai HongYun by far one of Hyzon's largest near-term customers.

[Image omitted]

To put the size of the order in context, the 100-truck-order supposedly placed in 2021 is larger than the Company's previously guided total deliveries for the year. The market duly reacted, causing Hyzon's stock to rip as high as 29% on the day.

If authentic, Hyzon's deal with Shanghai HongYun is worth as much as $250 million. [Footnote omitted.] For a commitment of that size, we would typically expect the counterparty to be a deep-pocketed and well-established logistics company with sufficient operating footprint, infrastructure and track record to purchase and deploy 500 new hydrogen fueled trucks.

But when we looked up Shanghai HongYun on China's National Enterprise Credit Information Publicity System, we found that Shanghai HongYun was **established only three days before Hyzon announced the deal.** [Image omitted.]

The Chinese corporate registry also shows that Shanghai HongYun has **no paid in capital**. [Image Omitted.]

26

With no paid in capital, the customer appears to be merely an empty shell company. Shanghai HongYun does not yet have an official phone number, email, WeChat or website that we could find. [Footnote Omitted.]

*\*\**

## 2.      Channel Checks Reveal Next Largest Customer Not Really a Customer; Significant 2021 Delivery and Guidance Miss

Hyzon's next largest customer is a tiny New Zealand startup who told us they are not really a customer. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.

Hiringa has long been a key customer in Hyzon's SPAC narrative. At the height of SPAC mania in February 2021, Hyzon announced that it had signed an agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021. [Footnote and image omitted.]

Hyzon also highlighted the Hiringa contract in a YouTube promotional video by its CEO Craig Knight in March 2021. [Image and link omitted.]

To channel check Hyzon's claims, we spoke with a senior Hiringa executive. Although they remain interested in the project, **Hiringa explained to us that they are not actually a customer,** but a **"channel partner"** for Hyzon's vehicles. Hiringa does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties.

*"We're effectively a channel partner model if you like."*

*"Our business model is not to buy the trucks. We do the refueling…. we're effectively an unpaid market channel"*

*"There's no point in us being the middleman. So [the end customer] will physically pay for the trucks and they will physically take title."*

-Hiringa Executive

*\*\**

This makes more sense, as Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks, being a company **with less than 20 employees according to LinkedIn [link omitted] and supposedly operating out of a house [link omitted] in New Zealand.** Rather than purchasing 1,500 trucks, Hiringa plans to build fuel stations with the hope of facilitating future purchases from end customers.

Hiringa also informed us that the **1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order**, and that it merely represents a right, not an obligation, to buy.

*"That's a right to buy, not an obligation to buy."*

*"At the end of the day it's not binding. That's not a binding purchase. It's a purchasing framework."*

- Hiringa Executive

***

In its investor presentation, Hyzon insisted that these 2021 orders are "100% certain." Not probable, but "100% certain." [Image omitted.]

Yet Hiringa's executive said that **Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest.**

*Hiringa: "Realistically with the supply chains, I think they will be arriving in March or April [2022]. There's also some work to do in quarter one in the Netherlands before they ship."*

*Blue Orca: "So you don't actually expect trucks this year? You expect them in the first quarter of 2022?"*

*Hiringa: "...March through May, if you like, or April through June [2022] is when we are going to be doing validation in New Zealand... it's not [a] full commercial operation."*

*Blue Orca: "So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. And those are the four validation units?"*

*Hiringa: "Yep, yep."*

- Hiringa Executive

* * *

### 3. Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections

In its much-hyped initial investor [link omitted] presentation filed in February 2021, Hyzon generated considerable buzz around its SPAC with a deck that included a number of big household names listed as "top tier customers," including Coca Cola, Nestle, Ikea, and Heineken. [Image omitted.]

For example, the February deck showed that Hyzon was finalizing purchase orders with the likes of Heineken and Ikea for vehicles to be delivered in 2021. Hyzon

also projected hundreds of millions in revenues from Coca-Cola in the next five years. [Image omitted.]

These names generated considerable enthusiasm, and Hyzon's stock price predictably exploded with investor interest. Yet like many other rotten EV SPACs (e.g. Lordstown Motors) [link omitted], these name brand customer relationships appear to have been largely illusory. Two months later, Hyzon's April investor presentation showed a very different customer list with most of the notable name brands missing.

Spot the difference:



Source: Hyzon February 2021 Investor Presentation , Hyzon April 2021 Investor Presentation

**Coca Cola. Gone. Heineken. Gone. Ikea. Gone.**

In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue-chip customers disappeared from its disclosures altogether. Amusingly, Hyzon was apparently so desperate to fill the gap left by the omission of its blue-chip customers that it included the logo of *Friesland Campina* twice in the latter deck.

\* \* \*

- **Former Executives Left in Part Because of Concerns over Misrepresentations on Customer Contracts.**

Hyzon's apparent misrepresentation of its key customers at the time of its SPAC is

consistent with the comments of one of its former senior executives with whom we spoke. The former executive indicated that he and other early senior Hyzon executives, all of whom left the Company, became uncomfortable with how Hyzon was presenting customer orders to investors.

*"I just didn't like the way it was being presented. A lot of the stuff that they are saying is open to interpretation how you read that. Saying that they've got all of these orders and things. But a lot of them are **all MoUs which as you know in the business mean basically nothing.***

*They were going out, kind of selling it as really what it wasn't at the time. **A bit like unfortunately what Nikola was doing.** It's kind of a lot of hype, and getting money through that hype from people who don't really understand.*

*You know it's great to show all these pictures of renderings of trucks and orders that you may have, but these orders, most of them...90% of them are MoUs so there's no binding contract, and if you look from when they've announced those [contracts], still none of those have been built or delivered.*

*The only three vehicles they have is what's on their website. These are all prototype vehicles. They're not production vehicles of any type. They've basically been hand built at the facilities. These are the things that I think, if you're going to announce that, say that. Be honest about it.*

***I was very uncomfortable with that.** A lot of these, if you look at their website, they've loaded lots of them on there of signed meetings they had. All these are MoUs that they've signed. **None of them are binding in any way whatsoever.***"

- Former Senior Hyzon Executive

\*\*\*

### 4. Hyzon is Just a Repackaging of Its Chinese Parent Company, a 17-Year-Old Business Recently Valued as a Microcap

There is a misconception in the market, perpetuated by the Company, that Hyzon has a unique first mover advantage because it has access to the allegedly valuable "fuel cell expertise" of its parent company, *Horizon*. [Image Omitted]

\* \* \*

The reality, in our opinion, is that Hyzon is simply a SPAC repackaging of a flailing Chinese parent which delisted from the Chinese OTC market at an enterprise value of only $190 million, and which for 17 years had failed to gain meaningful traction with its fuel cell technology.

\* \* \*

### 5. Hyzon's Projections are Fantasy: Parent's Financials and Former Executives Suggest Hyzon May Earn 5- 10% Gross Margins, at Best.

An interview with a former Hyzon executive and the financials of Hyzon's Chinese parent suggest that Hyzon's projected financials are likely a fantasy.

Without any current revenue, Hyzon's valuation relies entirely on its self-serving financial projections. Hyzon forecasts in its SPAC presentations that it will turn cash flow positive as early as 2023. By 2025, Hyzon tells investors that it will generate annual EBITDA of $505 million.

* * *

### 6.  Two CTO Resignations In 15 Months

Hyzon's stock price is contingent on the value of its technology to generate future revenues. We view it is as a significant red flag that **two of Hyzon's CTOs have resigned in the past 15 months**, even though Hyzon was only formed in January 2020.

On September 2, 2021, Hyzon announced that its Chief Technology Officer, Gary Robb, resigned after just 15 months in the role. The announcement should concern investors because as with other early-stage companies, Hyzon's valuation and future success rests largely on its product execution for which the CTO is responsible.

Hyzon claimed that Gary Robb retired. But we spoke to a former Hyzon executive who expressed skepticism about this narrative given Robb's relatively young age.

*"You know, they say he's retiring, but … it's kind of young to be retiring."*
        - Former Hyzon Executive

72.     On this news detailed in the Blue Orca Report, Hyzon's shares fell $2.58 per share, or 28%, to close at $6.63 per share on September 28, 2021—damaging investors.

73.     The Individual Defendants breached their fiduciary duties by allowing or permitting the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

74.     The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls and financial reporting,

31

75.     The Individual Defendants breached their fiduciary duties to Hyzon because, during the Relevant Period, they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, (a) illusory deals with blue-chip corporations; (b) that Hiringa was only a channel partner, not a buyer; (c) that Hyzon's financial projections were grossly inflated; and (d) that Hyzon was unable to meet vehicle deliverables in 2021.

## DAMAGES TO HYZON

76.     As a direct and proximate result of the Individual Defendants' conduct, Hyzon will lose and expend many millions of dollars.

77.     Such expenditures include, but are not limited to, legal fees associated with the Securities Action, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

78.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

79.     As a direct and proximate result of the Director Defendants' conduct, Hyzon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.     Plaintiff realleges each allegation above as if fully set forth herein.

81.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

82.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

83.     Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

84.     Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

85.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.

86.     Because of the facts set forth throughout this Complaint, demand on the Director Defendants (Defendants Anderson, Knight, Gordon, Brown, Gu, Edwards, Meng, Park, and Wong) to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

87.     The Board is currently comprised of the nine Director Defendants.  Thus, Plaintiff is only required to show that a majority of the Defendants, *i.e.*, five, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

88.     Demand is excused as to all Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the knowing conduct described herein. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

89.     Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

90.     Additionally, each of the Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Demand is further excused as to all Director Defendants because they were each elected as a result of the solicitations in the 2021 Proxy Statement, which contained false and misleading statements and material omissions.

**Defendant Erik Anderson**

91.     Defendant Erik Anderson is not disinterested or independent, and therefore, is incapable of considering demand because he served as Hyzon's Predecessor's CEO and serves as a director following the merger completion.

92.     As of March 26, 2021, Anderson held 2.3% of the Company's outstanding common stock, and any stock decline will affect him financially. The shares of DCRB Class B common stock held by WRG DCRB Investors, LLC, automatically converted into 5,643,125

shares of Class A Common Stock. WestRiver Management, LLC is the managing member and majority owner of WRG DCRB Investors, LLC with 82% ownership. Erik Anderson is the sole member of WestRiver Management, LLC and has voting and investment discretion with respect to the common stock held of record by WRG DCRB Investors, LLC.

93.     As a member of the Compensation Committee, Defendant Anderson was charged with evaluating the CEO's performance, and his failure to properly do so makes him especially culpable for the wrongful conduct described herein.

94.     This lack of independence and the financial benefits received by Defendant Anderson render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

95.     In addition, Defendant Anderson is a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

96.     As such, Defendant Anderson cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**<u>Defendant Knight</u>**

97.     Defendant Craig Knight is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Knight is an employee who derives substantially all of his wealth and livelihood from his relationship with the Company, making him not disinterested or independent.

98.     Additionally, his employee benefits include an annual target bonus opportunity of up to 70% of base salary, and he is eligible to receive a one-time grant under the 2021 Plan of 3% of the fully diluted outstanding shares of Hyzon Class A common stock immediately following

the merger closing. Therefore, Knight had a motive to conceal negative news concerning the Company's core products.

99.     Defendant Knight is also a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

100.    The lack of independence and the financial benefits received by Defendant Knight render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

101.    For these reasons, Defendant Knight breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and, therefore, excused.

**Defendant Gordon**

102.    Defendant Mark Gordon is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Gordon is an employee who derives substantially all of his wealth and livelihood from his relationship with the Company, making him not disinterested or independent.

103.    Additionally, his employee benefits include an annual target bonus opportunity of up to 70% of base salary and he is eligible to receive a one-time grant under the 2021 Plan of 3% of the fully diluted outstanding shares of Hyzon Class A common stock immediately following the merger closing. Therefore, Gordon had a motive to conceal negative news concerning the Company's core products.

104.    Defendant Gordon is also a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

105.    The lack of independence and the financial benefits received by Defendant Gordon render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

106.    Thus, for these reasons, too, Defendant Gordon breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and, therefore, excused.

**Defendants Brown, Park, and Wong**

107.    Defendants Brown, Park, and Wong are not disinterested or independent, and therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's inventory and operational logistics. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, these Defendants caused these improper statements.

108.    For these reasons, Defendants Brown, Park, and Wong breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested. Thus, demand upon Defendants Brown, Park, and Wong is futile and, therefore, excused.

**Defendant Gu**

109.    Defendant George Gu is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Gu is an employee who derives substantially

all of his wealth and livelihood from his relationship with the Company, making him not disinterested or independent.

110.    Additionally, his employee benefits include an annual target bonus opportunity of up to 70% of base salary, and he is eligible to receive a one-time grant under the 2021 Plan of 3% of the fully diluted outstanding shares of Hyzon Class A common stock immediately following the merger closing. Therefore, Gu had a motive to conceal negative news concerning the Company's core products.

111.    The lack of independence and the financial benefits received by Defendant Gu render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

112.    Thus, for these reasons, too, Defendant Gu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested. Thus, demand upon him is futile and, therefore, excused.

**Defendant Edwards and Meng**

113.     Defendants Edwards and Meng are not disinterested or independent, and therefore, are incapable of considering demand because they serve as members of the Compensation Committee and Nominating and Governance Committee.

114.    As members of the Compensation Committee, Defendants Edwards and Meng were charged with evaluating the CEO's performance, and their failure to properly do so makes them especially culpable for the wrongful conduct described herein.

115.    In addition, pursuant to the 2021 Equity Incentive Plan, Defendants Edwards and Meng were given an option to purchase shares of Common Stock, 177,250 and 44,313 shares, respectively; which were issuable upon the exercise of new Hyzon options or restricted stock units

issued in exchange for outstanding per-merger Hyzon options, or until certain events occur in the future.

116.    Thus, for these reasons, too, Defendants Edwards and Meng breached their fiduciary duties, face a substantial likelihood of liability, and are not independent or disinterested. Thus, demands upon Edwards and Meng are futile and, therefore, excused.

### Additional Demand Futility Allegations

117.    The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Directors to also adhere to Hyzon's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct.  The Directors violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

118.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand for the Directors would be futile.

119.    Hyzon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Hyzon any part of the damages the Company suffered and will continue to suffer, thereby. Thus, any demand for the Directors would be futile.

120.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused, as it would be futile.

121.    The acts complained of herein constitute violations of fiduciary duties owed by Hyzon's officers and directors, and these acts are incapable of ratification.

122.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e., monies belonging to the stockholders of Hyzon*. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Hyzon, there would be no directors' and officers' insurance protection.  Accordingly,

the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought

derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is

futile and, therefore, excused.

123.    If there is no directors' and officers' liability insurance, then the Directors will not

cause Hyzon to sue the Individual Defendants named herein, since, if they did, they would face a

large uninsured individual liability. Accordingly, demand is futile in that event, as well.

124.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of

them, certainly at least five of them, cannot consider a demand with disinterestedness and

independence.  Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT I
**(Violations of Section 14(a) of the Exchange Act Against Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, McDermott, Tepper, Tichio, and Warren)**

125.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully

set forth herein.

126.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

> [i]t shall be unlawful for any person, by use of the mails or by any means or
> instrumentality of interstate commerce or of any facility of a national securities
> exchange or otherwise, in contravention of such rules and regulations as the [SEC]
> may prescribe as necessary or appropriate in the public interest or for the protection
> of investors, to solicit or to permit the use of his name to solicit any proxy or consent
> or authorization in respect of any security (other than an exempted security)
> registered pursuant to section 12 of this title [15 U.S.C. § 78l].

127.    Rule 14a-9, provides that no proxy statement shall contain "any statement which,

at the time and in the light of the circumstances under which it is made, is false or misleading with

respect to any material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

128.    Under the direction and watch of Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, McDermott, Tepper, Tichio, and Warren, the Company made materially misleading statements in its 2021 Proxy Statement. Specifically, the 2021 Proxy Statement falsely stated and failed to disclose that (a) Hyzon's touted partnerships were illusory; (b) Hiringa was only a channel partner (c) Hyzon's financial projections were grossly inflated; and (d) Hyzon was unable to meet vehicle deliverables in 2021.

129.    Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, McDermott, Tepper, Tichio, and Warren knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the 2021 Proxy Statement were materially false and misleading.

130.    The Company was damaged as a result of Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, McDermott, Tepper, Tichio, and Warren's material misrepresentations and omissions in the 2021 Proxy Statement.

131.    Plaintiff has no adequate remedy at law.

**COUNT II**
**(Against The Individual Defendants**
**For Breach of Fiduciary Duty)**

132.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

133.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

134.    The Individual Defendants willfully ignored the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

135.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of disclosure, good faith, and loyalty. Specifically, the Individual Defendants made and permitted other Individual Defendants to make false and misleading statements concerning the Company's business, finances, and relationships, and failed to disclose that (a) Hyzon's touted partnerships were illusory; (b) Hiringa was only a channel partner (c) Hyzon's financial projections were grossly inflated; and (d) Hyzon was unable to meet vehicle deliverables in 2021.

136.    The Individual Defendants and the Board also breached their fiduciary duties by failing to implement or oversee a system to monitor, among other things, the adequacy of the Company's financial reporting.

137.    The Board failed to establish and/or oversee a reasonable information and reporting system related to the Company's financial reporting.

138.    The Individual Defendants also breached their fiduciary duties to Company shareholders by failing to take remedial action against the other Individual Defendants and by concealing the other Individual Defendants' fraudulent statements and material omissions.

139.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hyzon has sustained significant damages, as alleged herein.

140.    Plaintiff has no adequate remedy at law.

**COUNT III**
**(Against The Individual Defendants**
**For Aiding and Abetting Breaches of Fiduciary Duty)**

141.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

142.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired and schemed with one another to breach their fiduciary duties, wasted the Company's corporate assets, and engaged in the ultra vires and illegal conduct complained of herein.

143.    Plaintiff has no adequate remedy at law.

**COUNT IV**
**(Against The Individual Defendants For**
**Unjust Enrichment)**

144.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

145.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Hyzon.

146.    The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to Hyzon.

147.    Plaintiff, as a shareholder and representative of Hyzon, seeks restitution from the Individual Defendants, the imposition of a constructive trust over the Individual Defendants proceeds from their misconduct, and/or an order requiring defendants to disgorge all profits, benefits, and other compensation obtained through, or as a result of, their wrongful conduct and fiduciary breaches.

148.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

149.     Plaintiff has no adequate remedy at law.

## COUNT V
### (Against the Individual Defendants For Waste of Corporate Assets)

150.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

151.     Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Hyzon's internal controls by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

152.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

153.     As a direct and proximate result of defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

154.     Plaintiff has no adequate remedy at law.

## COUNT VI
### (Against the Individual Defendants For Abuse of Control and Gross Mismanagement)

155.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

156.     The Individual Defendants' misconduct alleged herein was an abuse of their ability to control the Company.

157.    Further, the Individual Defendants, either directly or through aiding and abetting, were derelict in their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company.

158.    As a direct and proximate result of the Individual Defendants' abuse of control, Hyzon has sustained significant damages.

159.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

160.    Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Hyzon and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding money damages in an amount exceeding $75,000 against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Directing Hyzon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hyzon and its stockholders from a repeat of the damaging events described herein;

E.       Awarding punitive damages;

F.       Awarding costs and disbursements of this action, including reasonable attorneys',

accountants', and experts' fees; and

G.       Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: February 2, 2022                    **RIGRODSKY LAW, P.A.**

                                           */s/ Seth D. Rigrodsky*
                                           Seth D. Rigrodsky (#3147)
                                           Gina M. Serra (#5387)
                                           Herbert Mondros (#3308)
                                           300 Delaware Avenue, Suite 210
                                           Wilmington, DE 19801
                                           (302) 295-5310

                                           **MOORE KUEHN, PLLC**
                                           Justin A. Kuehn
                                           Fletcher W. Moore
                                           30 Wall Street, 8th floor
                                           New York, New York 10005
                                           Tel: (212) 709-8245
                                           jkuehn@moorekuehn.com
                                           fmoore@moorekuehn.com

                                           *Counsel for Plaintiff*